UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re

DBSD NORTH AMERICA, INC., et al.,

                          Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SPRINT NEXTEL CORPORATION,

                          Appellant,

            -against-

DBSD NORTH AMERICA, INC., et al.,

                          Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DISH NETWORK CORPORATION,

                          Appellant,

            -against-

DBSD NORTH AMERICA, INC., et al.,

                          Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/24/10

09 Civ. 10156 (LAK)

(Chap. 11 Case No.
90-13061 (REG))

09 Civ. 10372 (LAK)
09 Civ. 10373 (LAK)

## MEMORANDUM AND ORDER

LEWIS A. KAPLAN, *District Judge.*

      This matter is before the Court on appeals by (a) DISH Network Corporation ("DISH") from (1) the Findings of Fact and Conclusions of Law Confirming Debtors' Second Amended Joint Plan of Reorganization (the "Confirmation Order") [Bankr. DI 547], and (2) the Decision on Debtors' Motion to Designate Dish Network's Vote to Reject Debtors' Reorganization Plan (the "Designation Order") [Bankr. DI 597], and (b) Sprint Nextel Corporation ("SPRINT") from the Confirmation Order. I assume familiarity with the extensive findings and conclusions contained in the Confirmation and Designation Order by Bankruptcy Judge Robert E. Gerber as well

as with his Bench Decision on Confirmation ("Bench Decision") [Bankr. DI 479]. As I find Judge Gerber's characteristically thorough analysis to have explicated the issues fully, I see no need to repeat what he has described in 134 pages of findings, conclusion and discussion and focus simply on the appellants' assignments of error.

*The DISH Appeals*

        1.     DISH first argues that the court below ignored contemporaneous market evidence and therefore erred in determining that DISH would receive the "indubitable equivalent" of its first lien claim.

        It is important at the outset to place this argument in context. The issue arose in the context of Judge Gerber's consideration of whether the cramdown feature of the plan was appropriate as respects DISH. At the outset, he held that the Section 1129(b) requirements for a cramdown did not have to be satisfied with respect to DISH in consequence of the designation of the DISH votes. Bench Dec. 37-42. While DISH objects to that conclusion (DISH Br. 43-48), I agree with Judge Gerber's reasoning. In consequence, DISH's "indubitable equivalent" argument is moot. Even if it were not, however, his determination that DISH will receive the indubitable equivalent pursuant to the plan is a finding of fact or, in any case, a mixed question of law and fact. I see no clear error of fact or error of law.   In consequence, his alternative conclusion that the cramdown requirements were satisfied is affirmed. Findings ¶ 47; Bench Dec. 9-12, 37-47.

        2.     DISH next contends that the court below erred in determining that the plan is feasible under Section 1129(A)(11) of the Code.

        To begin with, DISH does not seriously take issue with the Bankruptcy Court's holding that proof of feasibility does not require "that success be guaranteed." Bench Dec. 33. All that is required is that "the plan ha[ve] a reasonable likelihood of success." *Id.* (quoting *In re Adelphia Bus. Solutions, Inc.,* 341 B.R. 415, 421-22 (S.D.N.Y. 2003) (in turn citing *In re Johns Manville Corp.,* 843 F.2d 643, 650 (2d Cir. 1988)). Thus, its quarrel is with Judge Gerber's conclusion that this standard was satisfied here. Indeed, its argument essentially boils down to a matter of characterization – DISH's descriptor of choice being "speculative" while Judge Gerber spoke in terms of a reasonable likelihood.

        Here, the Bankruptcy Court relied on the "dramatic[] deleverag[ing]" of the Debtors upon emergence from Chapter 11, evidence that the Debtors had sufficient liquidity and would be able to meet working capital needs through current financing commitments and the likelihood that it would be able to secure additional financing or a strategic partnership when necessary, and credible testimony that the credit markets had loosened up. Bench Dec. 34-37.

        DISH's attack on the holding with respect to future financing or a strategic partnership is unpersuasive. The court below permissibly relied on (1) ample evidence that Sky Terra and TerreStar both had raised substantial funds in difficult markets and despite greater risk

factors and higher debt loads and (2) expert testimony of Yuri Brodsky of UBS, which it credited, that the Debtors' asset value would be sufficient to enable them to raise capital even if they had no revenue.

Finally, DISH's contention that the Bankruptcy Court deprived it of due process in relying for its feasibility finding on proposals that it considered only *in camera* is somewhat misleading and, in any case, ultimately without merit. It is somewhat misleading because (1) testimony was taken in open court as to the fact that proposals had been made, (2) the Bankruptcy Court considered only that fact, as distinguished from the detailed substance it reviewed *in camera,* (3) it explicitly stated it considered the *in camera* submissions only to the extent that they "provide[d] . . . comfort that the testimony" that proposals had been made "was truthful," and (4) it relied on the fact that proposals had been made only in support of its conclusion that the Debtors' "view that they'll be able to secure one or the other, if not both, is very reasonable." Bench Dec. 35 & n.106.

Even assuming *arguendo* that it was improper to consider the proposals *in camera,* I find that any such error was harmless. There was ample evidence to support the determination of feasibility without regard to the existence of these other proposals, and the decision below makes clear that the Bankruptcy Court would have reached the same result even in their absence.

3.      DISH argues next that the Bankruptcy Court (a) erred in designating its vote, and (b) in any case improperly created an additional remedy for the designation. These contentions are unconvincing.

First, the court below found "that DISH made its investment in this chapter 11 case, and has continued to act, not as a traditional creditor seeking to maximize its return on the debt it holds, but as a strategic investor, 'to establish control over this strategic asset.'" Designation Order 8. It therefore held that DISH had not acted in good faith and exercised its discretion to designated its vote under 11 U.S.C. § 1126(e). Designation Order 8-18. The finding of fact must be upheld unless clearly erroneous and the exercise of discretion unless it was an abuse. The holding that DISH's intention to establish control over the Debtors constituted bad faith within the meaning of the Code is subject to *de novo* review.

There is no convincing case for the proposition that the finding below was clearly erroneous. While DISH emphasizes evidence that it regards as favorable to it, there was an abundance of evidence supporting the finding. *E.g.,* Designation Order 3-8, Debtors' Br. 31-35. This Court is not left with "the definite and firm conviction that a mistake has been committed." *In re Manville Forest Prods. Corp.,* 896 F.2d at 1388 (quotation marks omitted).

Second, DISH's contention that the Bankruptcy Court created an additional remedy for the designation is sophistry, plain and simple. Section 1126(c) of the Code provides that:

"[a] class of claims has accepted a plan if such a plan has been accepted by

creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan."

DISH owned the only Class I Preterition Secured Claim. Once its vote was designated, there were no claimants in that class who could have voted either to accept or reject the plan. The court below therefore was required to construe Section 1126(c) on those unusual facts, and that is what it did. It most assuredly did not create an additional or supplemental remedy for the designation. Misleading rhetoric aside, therefore, DISH's argument comes down to the contention that the court below erred as a matter of law in construing Section 1126(c) as meaning that Class 1, on those facts, was vacant and could be disregarded for Section 1126(c) purposes or that it was to "be regarded as an accepting class." Bench Dec. 39-42.

DISH's argument to the contrary is unpersuasive. Were it accepted, its consequence would be that DISH – by purchasing all of the claims in that class and by engaging in conduct sufficiently egregious to warrant designation of its vote – would have achieved precisely what it set out to achieve. This Court agrees with Judge Gerber's resolution of this issue.

Third, it is not clear whether DISH means to argue that the Bankruptcy Court's finding "that DISH made its investment in this chapter 11 case, and has continued to act, not as a traditional creditor seeking to maximize its return on the debt it holds, but as a strategic investor, 'to establish control over this strategic asset,'" assuming it is not clearly erroneous, is insufficient to establish a lack of "good faith" within the meaning of Section 1126(e). Assuming that it does, however, this Court rejects the argument. As DISH's brief recognizes:

"courts have designated votes:

"1) if the claimant is using obstructive tactics and hold-up techniques to extract better treatment for its claim compared to the treated afforded similarly situated claimholders in the same class; or 2) if the holder of the claim casts its vote for the ulterior purpose of securing some advantage to which [the creditor] would not otherwise [have been] entitled; or 3) when the motivation behind its vote is not consistent with a creditor's protection of its own self-interest." DISH Br. 33-34 (quoting *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 60 (Bankr. S.D.N.Y. 2006)).

Judge Gerber here found that DISH in this case "act[ed] in furtherance of an ulterior motive, unrelated to its claim or its interests as a creditor" – "establish[ing] control over this strategic asset." Designation Order 9-10, 8. Given those findings, there was no error of law.

4.      DISH's contention that the Bankruptcy Court erred in finding that the plan

5

had been proposed in good faith is singularly unpersuasive.

*The SPRINT Appeal*

        1.     SPRINT first argues that the Bankruptcy Court's finding that the value of the reorganized Debtors' business was less than the amount of the Debtors' secured debt is clearly erroneous. It maintains that the Bankruptcy Court erroneously "adopted" the Debtors' valuation opinion, which, it claims, (1) did not take into account "improved market conditions" and (2) was based on analyses that were stale at the time of the confirmation hearing.

        There is abundant record evidence to support the Bankruptcy Court's findings as to the value of the Debtors' business. Judge Gerber's opinion exhaustively discusses all evidence presented by the parties and sets forth the methodology the Bankruptcy Court ultimately adopted. Further, the Bankruptcy Court expressly acknowledged "uncertainty in the markets" and credited the Debtors' expert valuation because it reflected the recent rise in the market price of comparable companies' debt securities. Bench Dec. 27-28. In any event, SPRINT neither offered its own valuation expert nor adduced any evidence to contradict the Bankruptcy Court's findings. In consequence, I see no clear error of fact.

        2.     SPRINT argues next that the Bankruptcy Court erred in determining that the plan satisfied the requirements of 11 U.S.C. § 1129(b)(2)(B), which is known as the absolute priority rule. It contends that the senior noteholders' "gift" to the existing stockholder violates the "plain language of the Bankruptcy Code" because it allegedly would circumvent the rights of the unsecured creditors, including SPRINT.

        SPRINT's argument is without merit. By its plain terms, the absolute priority rule applies only to distributions of "estate" property to holders of junior claims and interests that are "on account of such junior claim or interest." 11 U.S.C. § 1129(b)(2)(B)(ii). The rule therefore precludes the distribution of estate assets to junior creditors unless claims of more senior creditors are fully satisfied. Here, the senior noteholders, which concededly hold perfected security interests in substantially all of the Debtors' assets, are undercollateralized. In consequence, neither the unsecured creditors, including SPRINT, which are out of the money by over $100 million, nor the existing stockholder may receive a distribution on account of their claims or interests in the estates. Instead, the distribution SPRINT contests is a transfer of assets by the senior noteholders of property to which they are legally entitled. The absolute priority rule therefore does not apply.

        SPRINT rejoins that the property distributed under the plan – stock in the reorganized entity – "would not exist but for the [p]lan" and therefore "is not part of the Senior Noteholders' collateral." SPRINT Reply at 4-5. That argument is no more convincing.

        The plan provides the following with respect to Class 2, which consists of all senior noteholders:

        "In full and final satisfaction, release, and discharge of and in exchange for

6

each Allowed Senior Note Claim . . . each Holder of an Allowed Class 2 Senior Note Claim shall receive its Pro Rata share of the Senior Noteholders' Shares and shall be entitled to participate in the New Credit Facility . . . . The distributions to the Allowed Class 1 Claims and the Allowed Class 2 Claims take into account and conform to the relative priority and rights of the Claims in Class 1 and in Class 2 in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, and are in full settlement and discharge thereof." Plan ART. III § 2(b).

The plan thus expressly provides that the senior noteholders are to receive a distribution of stock in the reorganized entity according to their "relative priority" and "in full satisfaction and discharge" of their rights to the Debtors' collateral pursuant to the Bankruptcy Code. That stock will be theirs to dispose of as they will. The very terms of the plan therefore belie SPRINT's contention. I find no error of law.

*Conclusion*

        The orders appealed from are affirmed. The Clerk shall close the cases.

        SO ORDERED.

Dated:       March 24, 2010

                                    Lewis A. Kaplan
                             United States District Judge